STATE OF MINNESOTA v. LARS O. HONERUD.[1]

September 18, 1896.

Nos. 9930—(59).

**Constitution—Change of County Lines.**
Laws 1872, c. 87, entitled "An act to change the county lines of Otter Tail county," is constitutional; and townships 131 to 136, both inclusive, of range 44 W., are legally a part of the corporate territory of such county.

Case certified from the district court for Otter Tail county, Baxter and Searle, JJ., after findings and order for judgment in favor of plaintiff.    Affirmed.

*M. J. Daly* and *Houpt & Baxter*, for plaintiff.

*Lyman B. Everdell*, *Robert J. Wells*, and *Henry G. Wyvell*, for defendant.

[1] Reported in 68 N. W. 323.

START, C. J. In the list of delinquent taxes in and for the county of Otter Tail for the year 1893, which was duly filed in the office of the clerk of the district court of that county, there was included certain land in section 6, township 134 N., of range 44 W. The owner thereof, the defendant herein, appeared, and, for answer to the application for judgment against his land for such taxes, denied the jurisdiction of the court on the ground that the land was not within the territorial limits of the county of Otter Tail, but was a part of Wilkin county. The district court found that the land was a part of Otter Tail county, and ordered judgment for the taxes, and, on the application of the defendant, certified the matter to this court.

1. Townships 131 to 136, both inclusive, of range 44 W., were by the provisions of Laws 1872, c. 87, detached from Wilkin county, and made a part of the county of Otter Tail. The defendant's contention is that this law is unconstitutional, because it was never submitted to the electors of Wilkin county for adoption, as required by section 1 of article 11 of the constitution. His claim is that Wilkin county was at that time an organized county, and his land legally a part of its territory.

It seems to be conceded by counsel on both sides that the question whether the defendant's land is de jure a part of the territory of Otter Tail county can be raised by him in this proceeding by the state to enforce a tax against his land. This is a matter of first importance to the public, and we are unwilling by our silence indirectly to assent to the proposition that the question can be so raised. It would seem that where, as in the case at bar, territory by virtue of an act of the legislature has become de facto a part of a particular county, which has exercised jurisdiction over it for years, and the state has continuously recognized the territory as a part of such county, a citizen or taxpayer residing or owning property within the limits of such territory, when called upon to pay taxes, serve as a juror, or to discharge any other public duty or burden, ought not to be allowed to question the legality of the incorporation of the county, or the integrity of its publicly recognized corporate boundaries, by asserting the unconstitutionality of the legislative act. Considerations of sound public policy forbid it, and suggest that the question ought to be considered as a public one, to be raised only by the state itself by quo warranto or other direct proceeding. To permit pri-

66 M.—3

vate individuals to raise the question in collateral proceedings would manifestly result in serious consequences to public and private interests.

It is settled, upon principle and authority, that where a municipal corporation is acting under color of law, and its corporate existence is not questioned by the state, it cannot be collaterally drawn in question by private parties. The legal validity of a de facto municipal corporation will not be inquired into in a tax case. 1 Dillon, Mun. Corp. § 43; Cooley, Const. Lim. (6th Ed.) 309, 310; Cooley, Taxn. 768; People v. Maynard, 15 Mich. 463; Coe v. Gregory, 53 Mich. 19, 18 N. W. 541; Town of Geneva v. Cole, 61 Ill. 397; Rumsey v. People, 19 N. Y. 41. Why then, in this case, should the defendant be permitted to draw in question the legality of the de facto corporate boundaries of Otter Tail county, after they have been recognized and acquiesced in by all of the departments of the state government for nearly a quarter of a century?

As at present advised, we have little or no doubt as to the answer which ought to be given to this question; but in view of the public importance of this case, and the fact that we permitted counsel to argue and submit it on the merits, we deem it advisable to place our decision of the case upon the merits, and leave the question we have here suggested open for further consideration, should it ever arise.

2. The question of the constitutionality of the act of 1872, whereby township 134 of range 44 (of which the defendant's land is a part), with other towns, was detached from Wilkin, and made a part of Otter Tail, county, hinges on the further question whether Wilkin was at that time an organized county, within the meaning of the constitution. A solution of this last question involves a consideration of the previous legislation relating to Wilkin and adjoining counties, the undisputed evidence, and the findings of the trial court in this case as to the nonexistence in fact of any form of county government in such counties at the time such legislation was enacted.

On March 18, 1858, an act of the legislature entitled "An act to establish the boundaries of certain counties and provide for their organization," was approved. Sp. Laws 1858, c. 34. This law established and authorized the organization of the counties of Otter Tail, Breckenridge, and Becker, and fixed the boundaries of each. On the same day an act entitled "An act to establish the county of Toombs"

was also approved. Sp. Laws 1858, c. 64. This law fixed the boundaries of the county, and provided for the appointment of county commissioners for the county, with power to appoint all other county officers. By these acts the counties of Breckenridge and Toombs became organized counties, so far as the legislature could organize them. Thomas v. Hanson, 59 Minn. 274, 61 N. W. 135. The defendant's land was included within the boundaries of the county of Breckenridge, as established by Sp. Laws 1858, c. 34.

Sp. Laws 1860, c. 33, approved March 10. 1860, provided for a change in the boundaries of the counties of Toombs, Breckenridge, Otter Tail, and Becker, whereby the defendant's land would fall within the new boundaries of Toombs county. The act, however, expressly provided that it should take effect on and after its adoption by a majority of the electors of the several counties. It is recited and affirmed in Sp. Laws 1862, c. 32, that the act of March 10, 1860, was adopted by the electors in the manner required; but the trial court found—and the finding is sustained by the evidence—that no election was ever held under this act. Such being the fact, this act never became a law; and the land in question remained a part of Breckenridge county certainly until March 8, 1862, if not for a longer time.

On March 6, 1862, the name of Breckenridge county was changed to Clay. Sp. Laws 1862, c. 33. March 3, 1862, the legislature passed an act (senate file No. 47) changing the name of Toombs county to Andy Johnson; but the bill was lost before it reached the governor, and was never approved. See Senate Journal 1862, and Sp. Laws 1863, c. 13. The legislature, evidently assuming that senate file No. 47 had become a law, passed an act, approved March 8, 1862, entitled "An act to define the boundaries of the counties of Clay and Andy Johnson." Sp. Laws 1862, c. 25. This act purports to change the boundaries of the two counties so as to exclude the defendant's land from the territory of Clay, and include it within the limits of Andy Johnson, county. On March 6, 1863, by an act approved on that day, the name of Toombs county was changed to Andy Johnson, and by the second section thereof its boundaries, as fixed by the act of 1862, were reenacted. Sp. Laws 1863, c. 13. Neither this last act, nor the act of 1862, was submitted to the electors of either of the counties for adoption; but both acts, by their terms, were made to take effect on and after their passage. Assuming that these counties, or either of them,

at the time of the passage of the acts referred to, were in fact organized, it would seem that both acts were unconstitutional, and the disputed territory remained a part of Clay county.    However this may be, the question is here immaterial, in view of subsequent events and legislation.    In 1868 the name of Andy Johnson county was changed to Wilkin.    Laws 1868, c. 115.    We shall therefore, as we proceed, refer to Breckenridge county as Clay, and Toombs as Wilkin, county.

As a result of the Indian massacre of 1862, each of these counties was entirely depopulated, and every vestige of a county organization or government in fact was extinguished.    It appears from the undisputed evidence that the commandant of Fort Abercrombie issued an order that all of the inhabitants of the two counties should be brought into the fort, whether they were willing to come or not, and sent out a military force to enforce the order, and all of the people were brought in, except three men, who were afterwards killed at Breckenridge.    These counties remained practically without people until the year 1867, and absolutely without any county organization or government in fact until the year 1872, when, for the organization of each of them, Laws 1872, cc. 80, 83, were enacted.

In the meantime the legislature treated these counties as unorganized counties, in accordance with the then existing fact.    Accordingly they were attached to Stearns county, for judicial and other purposes, by Laws 1864, c. 67, and in 1866 the laws providing for their organization, and fixing their boundaries (Sp. Laws 1858, cc. 34, 64; Sp. Laws 1862, c. 25; and Sp. Laws 1863, c. 13, § 2), were expressly repealed by G. S. 1866, c. 122.    The boundaries of Wilkin (then Andy Johnson) and Clay counties were established by G. S. 1866, c. 8, §§ 3, 15.    So that townships 131 to 136, both inclusive, of range 44 (which include the defendant's land), were within the territorial limits of Wilkin county; and both counties were, by G. S. 1866, c. 64, § 33, attached to Crow Wing county for judicial and other purposes, and by Laws 1867, c. 113, they were attached to the county of Douglas.

By an act entitled "An act to change the county lines of Otter Tail county," approved February 28, 1872 (Laws 1872, c. 87), the tier of townships above mentioned were detached from the county of Wilkin, and attached to, and made a part of, Otter Tail county, to take effect after ratification by the electors of Otter Tail county only.

This act was duly ratified and adopted by such electors at the then next general election, and such townships have been ever since, in fact, a part of the territory of Otter Tail county. The legislature, by an act entitled "An act to provide for the organization of the county of Wilkin and to define the boundary thereof," approved March 4, 1872 (Laws 1872, c. 83), established the boundaries of the county so as to exclude from its territory the disputed townships, which were made a part of Otter Tail county by the act of February 28, 1872.

It is obvious that if the legislation whereby the laws providing for the organization of the counties of Clay and Wilkin were repealed, and the counties attached to other counties for all judicial and other governmental purposes, is valid, they were not thereafter organized counties, either in law or fact, prior to the time of their organization in 1872. It is claimed, however, by the defendant, that such legislation is unconstitutional; basing his claim upon article 11, § 1, of the constitution, which reads as follows:

"The legislature may, from time to time, establish and organize new counties; but no new county shall contain less than four hundred square miles, nor shall any county be reduced below that amount; and all laws changing county lines in counties already organized, or for removing county seats, shall, before taking effect, be submitted to the electors of the county or counties to be affected thereby, at the next general election after the passage thereof, and be adopted by a majority of such electors. Counties now established may be enlarged but not reduced below four hundred square miles."

This section was construed in the case of State v. McFadden, 23 Minn. 40; and it was held by this court that legislative power over counties is supreme, except as restrained by the constitution, and that the restraints imposed on such power by the constitution did not prohibit the legislature from reducing an organized county to an unorganized or established one by repealing the act providing for its organization, and attaching it to an organized county for judicial and other governmental purposes. This conclusion was based upon the proposition that the constitution made a clear distinction between an established (that is, an unorganized) and an organized county, and that as to the latter its boundary lines cannot be changed at all, except by a vote of the majority of the electors of the county or counties to be affected thereby; but as to the former (an unorgan-

ized county) the only constitutional restriction is that against re-
ducing its territorial area below 400 square miles,—or, in other
words, that the whole purport and effect of the limitations upon leg-
islative power imposed by the section under consideration is to pro-
hibit the legislature from reducing the area of any county, organized
or unorganized, below the standard fixed by the constitution; also
from removing county seats, and from changing the boundaries of
any organized counties, without the consent of the people to be af-
fected thereby.

If this construction of the constitution is correct, and the case of
State v. McFadden is to be adhered to, it logically follows that the leg-
islation here in question is valid, for the reason that the effect of such
legislation was to undo whatever organization, if any, which once exist-
ed in Wilkin county, and reduce it to an unorganized county, so that
the legislature could change its boundaries without a vote of the
electors of such county.    See Thomas v. Hanson, 59 Minn. 274, 61
N. W. 135.    But, in the case of State v. McFadden, while Chief Jus-
tice Gilfillan conceded that the constitution makes a clear distinction
between organized and unorganized counties, and that as to the lat-
ter there is no restricton upon the power of the legislature, except
that they shall not be reduced in area below 400 square miles, and
that, subject to this restriction, the legislature may at its pleasure
absolutely change the boundaries of unorganized counties, yet, in an
opinion of great vigor and logical force, he dissented from the propo-
sition that the legislature can repeal the act under which a county
has become in fact organized, and thereby place it in the class of un-
organized counties.    He said in this connection: [2]

"If the legislature may reduce a county from the condition of an
organized to that of an established county, all that is needed, to al-
low the legislature to do what the constitution prohibits, is to abol-
ish the organization of the counties with respect to which it may de-
sire to exercise the power to change."

It is unnecessary for us here to decide whether so much of the
rule declared by a majority of the court in the case to which we
have referred, to the effect that the legislature may, by repealing the
act authorizing its organization, reduce a county which is in fact

[2] 23 Minn. 46.

and in law duly organized to the condition of an unorganized county, ought, either upon principle or the doctrine of stare decisis, to be followed in its entirety. The legislation now under consideration can be sustained without going to this extreme.

An "organized county," as the term is used in our constitution, means a county which is organized in fact, and has its lawful officers, legal machinery, and means of carrying out the powers and performing the duties pertaining to it as a quasi municipal corporation. An act of the legislature declaring a county to be organized, and providing for the appointment of the necessary officers to institute a county government, does not make it an organized county. There must be people in the county, and the executive department of the state must act, before it is organized in fact. Whenever, by reason of war or other cause, there are no people in what was at one time an organized county, and there is no semblance of a county government within its limits, it is not, within the meaning of the constitution, an organized county. In such a case there are no rights or interests, public or private, which the restrictions of the constitution were intended to protect. When such a county has become by the logic of events disorganized in fact, the law providing for its organization remains, in legal effect, an enabling act, authorizing the executive department, perhaps, to reorganize the county; but the legislature could, in any view of the case, repeal the law at any time before the county was actually reorganized, just as it might have repealed the act at any time before the county was originally organized by virtue thereof.

The counties of Clay and Wilkin being unorganized in fact at the time of the repeal of the laws under which they were originally organized, it follows that the repealing acts, and the statutes attaching the counties to an organized county for judicial and other purposes, were constitutional, and thereafter such counties became and continued to be established or unorganized counties until the legislature provided for their organization in the year 1872. The county of Wilkin being an unorganized county, the legislature could change its boundaries, subject to the limitation that its area could not be reduced below 400 square miles, as it pleased, without submitting the matter to the electors of the county. Therefore the act of February 28, 1872, detaching the townships here in controversy from such county, and making them a part of Otter Tail county, and sub-

mitting the question of the adoption of the act to the electors of the latter county alone, was constitutional.

3. It is further claimed that this act is unconstitutional for the reason that its subject is not expressed in its title, which is, "An act to change the boundaries of Otter Tail county." The precise point made is that there is nothing in this title to indicate that the boundaries of the county of Wilkin are to be changed. But a change in the boundaries of one county cannot be made without making a corresponding change in the boundaries of one or more adjoining counties. The subject of this act is expressed in its title, within the meaning of the constitution. City of Winona v. School Dist. No. 82, 40 Minn. 13, 41 N. W. 539; State v. Gallagher, 42 Minn. 449, 44 N. W. 529.

The law whereby townships 131 to 136, both inclusive, of range 44, were made a part of Otter Tail county, being valid, it follows that the defendant's land is subject to taxation in that county, and that the order for judgment for the taxes against it must be affirmed. So ordered.