CITY OF ROCHESTER, petitioner,
Respondent,

v.

PEOPLES COOPERATIVE POWER AS-
SOCIATION, INC., et al., Respondents
(C8–93–19, C7–93–75), Appellants (C4–
93–20, CX–93–37),

United States of America, through its Ad-
ministrator of the Rural Electrification
Administration, et al., Appellants (C3–
93–39), Respondents (C7–93–75),

Minnesota Public Utilities Commission,
Intervenor, Appellant (C8–93–19,
C7–93–75).

Nos. C8–93–19, C4–93–20, CX–93–
37, C3–93–39, C7–93–75.

Court of Appeals of Minnesota.

Aug. 31, 1993.

Joseph F. Chase, Julia E. Utz, O'Brien, Ehrick, Wolf, Deaner, & Maus, Rochester, for City of Rochester.

Kenneth R. Moen, Dunlap, Finseth, Berndt & Sandberg, P.A., Rochester, for Peoples Co-op. Power Ass'n, Inc.

Francis X. Hermann, U.S. Atty., Thomas M. Bondy, U.S. Dept. of Justice, Civ. Div., Appellate Staff, Washington, DC, Lonnie F. Bryan, Asst. U.S. Atty., Minneapolis, for U.S.

Hubert H. Humphrey, III, Atty. Gen., Margie E. Hendriksen, Katherine L. McGill, Brent Lee Vanderlinden, Asst. Attys. Gen., St. Paul, for Minnesota Public Utilities Com'n, intervenor.

Andrew J. Shea, Corey J. Ayling, McGrann, Shea, Franzen, Carnival, Straughn & Lamb, Minneapolis, Crowell & Moring, Washington, DC, for amici curiae American Public Power Ass'n and National League of Cities.

Harold P. LeVander, Jr., William J. Hassing, Maun & Simon, St. Paul, for amici curiae Minnesota Rural Elec. Ass'n, Nat'l Rural Elec. Co-op. Ass'n, and Nat'l Rural Utilities Co-op. Finance Corp.

Considered and decided by FORSBERG, P.J., and PARKER and SCHULTZ *, JJ.

## OPINION

FORSBERG, Judge.

This appeal is from a district court order authorizing the City of Rochester to acquire,

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

by "quick-take," certain electric service rights previously assigned by the Minnesota Public Utilities Commission to Peoples Cooperative Power Association. We affirm.

## FACTS

In 1971, the Minnesota legislature approved special legislation authorizing any city within a joint sewer district in Olmsted County to annex, by ordinance, part or all of the joint district. 1971 Minn.Laws ch. 916, § 26, *amended by* 1973 Minn.Laws ch. 88, § 1. In April 1973, a joint sewer district known as the Willow Creek Sanitary Sewer District ("Willow Creek") was created in Olmsted County on the southern side of the City of Rochester ("City"). On November 10, 1989, the City published notice of a hearing to annex a portion of Willow Creek. An ordinance providing for annexation of Willow Creek was adopted and became effective on December 31, 1989.

Willow Creek is located within an electric service territory that the Minnesota Public Utilities Commission ("MPUC") had previously assigned to Peoples Cooperative Power Association ("Peoples"). *See* Minn.Stat. § 216B.37 (1990) (providing for assignment of exclusive service areas to electric utilities throughout the state). In January 1990 and thereafter, the City filed several petitions to condemn, by "quick-take," Peoples' electric service rights in the Willow Creek area. By those eminent domain proceedings, the City sought to extend its own utility service to the annexed area.

Peoples and the MPUC asserted that the City could not condemn the service rights, but was required to purchase Peoples' facilities in the manner directed by the Public Utilities Act, Minn.Stat. §§ 216B.44–46 (1990). Sections 216B.44–46 provide for payment of value determined by the parties, or by the MPUC in the event of a dispute. The district court concluded that the City had the right either to purchase Peoples' service rights pursuant to sections 216B.44–46, or to proceed by eminent domain, as authorized by Minn.Stat. § 216B.47 (1990). The district court, however, invoked the doctrine of primary jurisdiction and declined to exercise jurisdiction over the City's condemnation proceedings, concluding the matter lay more within the MPUC's expertise.

Ultimately, the supreme court reversed, concluding the doctrine of primary jurisdiction was inapplicable. *City of Rochester v. People's Coop. Power Ass'n, Inc.,* 483 N.W.2d 477 (Minn.1992). The supreme court concluded that a municipality may extend its provision of utility service to annexed territory either by purchase under terms determined by the MPUC pursuant to sections 216B.44–46 or by eminent domain proceedings under the jurisdiction of the courts, pursuant to section 216B.47. *Id.* at 481.

On remand, the district court conducted evidentiary hearings, granted the City's condemnation petition, and authorized the City to immediately acquire, by "quick-take," electric service rights to a planned Mayo Clinic incinerator project located within the annexed Willow Creek area.

The district court considered arguments by appellants High Forest Township and DeWayne Mattson challenging the City's original annexation of the Willow Creek area. The court concluded the challenge to the annexation constituted an impermissible collateral attack, in the context of these eminent domain proceedings.

The district court also considered and rejected arguments by the United States that Minnesota's quick-take condemnation procedures are preempted by the Rural Electrification Act, 7 U.S.C.A. §§ 901–940, where the condemned property is financed by the Rural Electrification Administration. Finally, the district court dismissed the MPUC as an intervenor in these proceedings.

The parties filed various appeals and petitions for discretionary review of the district court's order. This court accepted and consolidated all of the appeals and petitions for discretionary review.

## ISSUES

1. Did the district court err by concluding that the challenge to the annexation, in the context of these eminent domain proceedings, constituted an impermissible collateral attack?

2. Where public utility property is financed by the Rural Electrification Administration, are Minnesota's quick-take condemnation procedures preempted by the Rural Electrification Act?

3. Did the district court err by finding that quick-take was reasonably necessary and did not conflict with the Minnesota Public Utilities Act?

4. Did the district court err by dismissing the MPUC's intervention in these proceedings?

## ANALYSIS

■ 1. Appellants High Forest Township and DeWayne Mattson challenge the City's annexation of Willow Creek. The district court concluded that, in the context of these eminent domain proceedings, appellants' challenge to the annexation constituted an impermissible collateral attack. We agree.

Several Minnesota decisions have addressed challenges to annexations or detachments. Those cases indicate that in Minnesota, collateral attacks on annexations are viewed with disfavor; any challenge to an annexation should be brought by a quo warranto or declaratory judgment proceeding.

In *State ex rel. Danielson v. Village of Mound*, 234 Minn. 531, 48 N.W.2d 855 (1951), the court explained:

Immediately after an annexation proceeding has been completed, a *de facto* annexation exists; rights and liabilities have necessarily been created. To permit private individuals to question collaterally the validity of annexation proceedings at any time thereafter would cause serious consequences to public and private interests.

*Id.* at 540, 48 N.W.2d at 862; *see also City of Glencoe v. Beneke*, 288 Minn. 190, 194, 179 N.W.2d 279, 281 (1970) (refusing to consider collateral attack on prior annexation); *Town of Burnsville v. City of Bloomington*, 264 Minn. 133, 117 N.W.2d 746 (1962) (reaffirming use·of quo warranto and also authorizing "direct attack" by declaratory judgment upon annexation); *State v. Honerud*, 66 Minn. 32, 34, 68 N.W. 323 (1896) ("It is settled, upon principle and authority, that where a municipal corporation is acting under color of law,

and its corporate existence is not questioned by the state, it cannot be collaterally drawn in question by private parties").

■ Appellants argue that even if their challenge to the annexation constitutes an impermissible collateral attack, their claims should not be dismissed because, if they were to pursue those claims in a separate proceeding, such proceeding could be consolidated with the present case. We decline to sanction such "consolidation," which would in effect abrogate the rule against collateral attacks.

■ We note that even if appellants' challenge to the annexation did not constitute a collateral attack, we would reject that challenge on the merits. Appellants' challenge rests in part upon a claim that the special legislation under which the annexation proceeded was impliedly repealed by amendments to the statute delegating authority over annexations to the Minnesota Municipal Board. *See* 1978 Minn.Laws ch. 705. However, "[r]epeals by implication are not favored in this state." *State v. City of Duluth*, 238 Minn. 128, 131, 56 N.W.2d 416, 418 (1952). The supreme court has stated:

[A] special statute providing for a particular place, or applicable to a particular locality, is not repealed by a statute general in its terms and application, unless the intention of the legislature to repeal or alter the special law is manifest, although the terms of the general act would, taken strictly and but for the special law, include the case or cases provided for by it.

*State ex rel. Stanchfield v. Salisbury*, 228 Minn. 367, 374, 37 N.W.2d 444, 448 (1949) (quoting 1 Sutherland, Statutory Construction, § 274).

Appellants also claim their due process rights were violated because the City failed to provide proper notice of the annexation proceedings. A similar argument was considered and rejected in *In re Detachment of Unplatted Lands from City of Owatonna*, 183 Minn. 164, 236 N.W. 195 (1931), where the court concluded a statute providing for detachment of land was not unconstitutional even though it did not require notice to land-

owners who did not join in detachment petition.

2. The Rural Electrification Act, 7 U.S.C.A. §§ 901–940, ("the RE Act") established the Rural Electrification Administration ("REA") in 1936. The REA has financed all of Peoples' facilities in the Willow Creek area.

The United States and its amici (hereinafter "United States") argue the City's quick-take proceedings are preempted by the RE Act, pursuant to the Supremacy Clause of the United States Constitution.[1]

■ The United States asserts the City's quick-take proceedings are preempted by express language in the RE Act:

No borrower of funds under \* \* \* this title shall, without the approval of the Administrator, sell or dispose of its property, rights, or franchises, acquired under the provisions of this chapter, until any loan obtained from the Rural Electrification Administration, including all interest and charges, shall have been repaid.

7 U.S.C.A. § 907. The United States argues that Peoples is in effect "selling or disposing" of its REA-financed property, without the permission of the REA.

We decline to adopt such a strained construction of the phrase "sell or dispose." The Act restricts actions by the "borrower of funds"—in this case, Peoples. Peoples itself is not selling or disposing of its property; rather, the City is taking that property from Peoples. Important concerns justify such a distinction. Voluntary sales or disposals of REA-financed property by a borrower would not guarantee fair or adequate compensation. Condemnation proceedings, on the other hand, entail a careful determination and payment of fair value for that property.

■ The United States argues alternatively that the City's quick-take procedure is preempted because it impermissibly interferes with the purposes of the RE Act. See

*Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 401, 85 L.Ed. 581 (1941) (preemption may occur when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress").

The stated purpose of the RE Act is to make loans "for rural electrification and the furnishing of electric energy to persons in rural areas." 7 U.S.C.A. § 902.[2] In *Decatur County Rural Elec. Membership Corp. v. Public Serv. Co. of Indiana*, 261 Ind. 128, 301 N.E.2d 191 (1973), it was determined a state statute did not interfere with the policy of rural electrification. The court explained:

[T]he purpose for [a cooperative's] existence expires when the area which it serves becomes "urbanized." Once an area, which was theretofore "rural," is included within a municipality of 1,500 or more and becomes urban, it clearly falls outside the ambit of the Rural Electrification Act. Therefore, [the statute authorizing municipal annexation] in no way contravenes the Supremacy Clause.

*Id.* 301 N.E.2d at 198. Similarly, here, after the City annexed the Willow Creek area, such area became "urban"; therefore any subsequent condemnation of the utility property in that area did not interfere with the purpose of the RE Act.

The United States also argues that municipal condemnation of an REA-financed cooperative has the potential to interfere with the entire REA system. The United States cites three federal cases that have reached this same conclusion. See *Public Utility Dist. No. 1 of Franklin County v. Big Bend Elec. Coop., Inc.*, 618 F.2d 601 (9th Cir.1980); *Public Util. Dist. No. 1 of Pend Oreille County v. United States*, 417 F.2d 200 (9th Cir.1969); *City of Morgan City v. South Louisiana Elec.*, No. 91–0523, 1993 WL 118087, (W.D.La. Feb. 25, 1993).

We recognize the concerns raised by the cited cases; however, we find more persua-

---

1. "The laws of the United States \* \* \* shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding." U.S. Const. art. VI, cl. 2.

2. A "rural area" is any area "not included within the boundaries of any city, village, or borough having a population in excess of fifteen hundred inhabitants." 7 U.S.C.A. § 913.

sive the views stated by the Supreme Court in *Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 387, 103 S.Ct. 1905, 1914 n. 11, 76 L.Ed.2d 1 (1983). There, the court concluded that the RE Act did not preempt a state's assertion of jurisdiction over an REA-financed utility's wholesale rates. The court examined the argument that the state's assertion of jurisdiction over rates interfered with the REA's pervasive involvement in the management of the utilities to which it loans funds. The court concluded that the legislative history and the REA's own published policy indicated an intent that the states could set rates and that the REA was expected to operate "within the constraints of existing state regulatory schemes." *Id.* at 386, 103 S.Ct. at 1913. The *Arkansas Electric* court noted, however, that federal preemption of a cooperative's wholesale rates could occur if a particular rate set by the state "may so seriously compromise important federal interests, including the ability of the [cooperative] to repay its loans, as to be implicitly pre-empted by the Rural Electrification Act." *Id.* at 388, 103 S.Ct. at 1915.

■ Similarly, here, we conclude a municipality's condemnation of an REA-financed cooperative's property is authorized unless such condemnation so seriously compromises the REA's interests, including the ability of the cooperative to repay its loans, as to be implicitly preempted. In the present case, the United States has not demonstrated that the City's condemnation of Peoples' utility rights will compromise the REA's interests to a greater degree than any other condemnation.

Finally, the United States argues that Minnesota's quick-take procedures must be always preempted by the RE Act because there is insufficient time during quick-take proceedings to examine the REA's interests. The United States apparently bases this argument upon a belief that quick-take proceedings are more limited in duration or scope than general condemnation proceedings.

■ The statutory quick-take procedure "is not a separate kind of condemnation proceeding; it is a step in a condemnation proceeding." *Fine v. City of Minneapolis*, 391 N.W.2d 853, 855 (Minn.1986). The condemnation statutes and applicable case law do not suggest that the hearing afforded the parties in quick-take proceedings is any more limited than the hearing afforded in general condemnation proceedings. Rather, the "quick" portion of the quick-take occurs after the judicial hearing to ascertain the authority of the taking. In fact, in several cases, the supreme court has discussed the extent of quick-take hearings. *See, e.g., In·re Condemnation by the Minneapolis Community Dev. Agency of Certain Lands*, 439 N.W.2d 708, 710–11 (Minn.1989), *cert. denied*, 493 U.S. 894, 110 S.Ct. 244, 107 L.Ed.2d 194 (1989); *City of Minneapolis v. Wurtele*, 291 N.W.2d 386, 395–96 (Minn.1980); *Cooperative Power Ass'n v. Eaton*, 284 N.W.2d 395, 397–98 (Minn.1979).

As the City notes, the United States has had three years to muster its arguments that these condemnation proceedings are preempted by the RE Act. The City's original petitions for condemnation and quick-take of the Willow Creek area were filed on January 31, 1990. During the entire course of these proceedings, the United States was certainly aware the utility property would be taken by the City, either by purchase under the Public Utilities Act or by eminent domain. The United States has had ample time in which it could have raised and addressed the preemption issue.

■ 3. The district court found that the City had demonstrated it was necessary to quick-take the rights to serve the Mayo incinerator. However, the court recognized that at the time of the hearing, the City would be unable to effectively serve the incinerator for five or six months.[3] Accordingly, the court allowed Peoples to provide temporary service during the construction of the incinerator, until the City could build its lines and facilities to the property. At that point,

3. There was evidence that the City could serve the construction of the incinerator by using a generator; however, the City concedes that

method would be less reliable and more expensive.

the court found the City should provide permanent service to the incinerator.

The MPUC and Peoples claim the court erred by awarding the City the quick-take rights to serve the incinerator when the evidence established that the City could not immediately serve the incinerator. The MPUC claims this arrangement violates the exclusive service rights provisions in the Public Utilities Act. *See* Minn.Stat. § 216B.37. The MPUC expresses concern that once Peoples' exclusive right to serve the area is removed, Peoples has no corresponding duty to serve the area. According to the MPUC, the City's actions threaten the provision of reliable service and could result in a service hiatus.

The City responds that the MPUC's hiatus argument is illusory, because in reality, utilities come together and work out satisfactory transfer arrangements. The record supports the City's claim.

Furthermore, as the City notes, in all likelihood there would be a hiatus even if there were no quick-take. The City correctly points out that if there had been no quick-take of the rights to serve the incinerator, a final award of damages and transfer of property would still precede the City's ability to serve the incinerator.

The MPUC claims that the district court, by awarding "temporary" (construction) service rights to Peoples and "permanent" service rights to the City, in effect created a new definition of "electric service," thus violating the exclusive service provisions of Minn.Stat. § 216B.37. The MPUC cites *City of Willmar Municipal Utils. Comm'n v. Kandiyohi Coop. Elec. Power Ass'n*, 452 N.W.2d 699 (Minn.App.1990), *pet. for rev. denied* (Minn. Apr. 27, 1990), where the court held that the MPUC, rather than a district court, was the proper forum to determine whether an assigned service area was "receiving electric service" prior to annexation, for compensation purposes.

We conclude the *City of Willmar* case is distinguishable on its facts. Furthermore, as the City argues, the district court's decision in the present case did not construe a statutory term or create a new type of utility

"service"; rather, the court simply allowed Peoples to serve the incinerator temporarily during the construction phase, until the City is able to provide service to the incinerator.

The MPUC also argues that the quick-take will result in an unnecessary duplication of facilities in the incinerator area, in violation of the purposes of the Public Utilities Act. Whether the City proceeds by quick-take or general condemnation, however, the City will be building its own lines and facilities in territory previously served by Peoples. Whether or not the City proceeds before or after the condemnation award is not relevant.

The MPUC claims the City's quick-take of a single customer, instead of the entire area, violates the exclusive service area requirements of the Public Utilities Act. The MPUC is apparently concerned that the City will take the incinerator and abandon the remainder of the area. The MPUC raised this same argument during its first appeal. *City of Rochester*, 483 N.W.2d at 480. The supreme court apparently did not believe this argument was dispositive of the issue whether the City could condemn the incinerator. The City has sought to generally condemn the entire Willow Creek area, and intends to install facilities to serve that area. There would be no reason for the City to use the quick-take procedure for the entire area, because the City only claims a need for service rights to the incinerator site prior to the condemnation award.

The district court found that the City, through the Southern Minnesota Municipal Power Association, could offer the incinerator an Economic Development Incentive Rate (EDI), which would not be available unless the City were to supply power to the incinerator from the first day the incinerator receives permanent service. The MPUC argues that the availability of the EDI discount for the incinerator does not justify the quick-take decision. The MPUC claims such action violates the prohibition that

> [n]o public utility shall, as to rates or service, make or grant any unreasonable preference or advantage to any person or sub-

ject any person to any unreasonable prejudice or disadvantage.

Minn.Stat. § 216B.07 (1990).

First, as the MPUC itself recognizes, this statute does not apply to municipal utilities, which are not subject to MPUC rate regulation. *See* Minn.Stat. § 216B.01 (1990). Second, the MPUC does not explain why it believes the EDI rate constitutes an "unreasonable" preference or subjects any other ratepayer to an "unreasonable prejudice or disadvantage."

4. At the commencement of these proceedings, the MPUC moved to intervene. The district court allowed the intervention, stating it would consider the MPUC's arguments and rule on the intervention motion at the end of the case. Following the hearings, the district court concluded the MPUC's intervention should be dismissed.

The MPUC claims the district court erred by dismissing its intervention. The MPUC cites two bases for its original intervention: permissive intervention under Minn.R.Civ.P. 24.02, and intervention as a matter of right under Minn.R.Civ.P. 24.01.

The record contains no evidence that the MPUC originally sought to intervene as a matter of right. In fact, as late as August 1992, the MPUC claimed it had applied for permissive intervention under rule 24.02. Accordingly, we *decline to consider* the MPUC's arguments regarding intervention of right. *See Eakman v. Brutger*, 285 N.W.2d 95, 97 (Minn.1979) (issues not raised below may not be considered on appeal).

Where a trial court has ruled on the issue of permissive intervention, this court will not reverse absent a clear abuse of discretion. *SST, Inc. v. City of Minneapolis*, 288 N.W.2d 225, 231 (Minn.1979). The district court concluded that the MPUC's continued involvement would complicate and further delay these proceedings. Complication of issues is a proper consideration in permissive intervention cases. *Norman v. Refsland*, 383 N.W.2d 673, 677 (Minn.1986).

The remainder of these proceedings will only involve the dollar value of Peoples' service rights. The district court indicated that the MPUC would probably be allowed amicus or witness status, which would be sufficient to protect the MPUC's interests. This conclusion is supported by the following language from the *City of Rochester* opinion:

> [T]here is no issue as to the propriety of the expansion or concerning the municipality's right to acquire the facilities, * * * nor is there an implication of those matters to which the MPUC's expertise and supervisory powers are directed in its broad legislative charge.

*City of Rochester*, 483 N.W.2d at 480. The *City of Rochester* court recognized the competence of court-appointed commissioners and concluded the determination of damages was not a matter uniquely suited to the MPUC's abilities. The court concluded:

> "[J]ust compensation" [is] an issue guided in either forum by identical considerations and not implicating the unique administrative experience of the [MPUC].

*Id.* at 481. In light of the above analysis, we conclude the district court did not abuse its discretion by dismissing the MPUC's permissive intervention.

### DECISION

The district court did not err by granting the City's quick-take petition, disallowing the challenge to the prior annexation, and dismissing the MPUC's permissive intervention.

**Affirmed.**