United States Court of Appeals,

Fifth Circuit.

No. 93-4295.

CITY OF MORGAN CITY, Plaintiff-Intervenor-Defendant-Appellant,

v.

SOUTH LOUISIANA ELECTRIC COOPERATIVE ASSOCIATION, Defendant-Intervenor-Appellee, Third Party-Plaintiff-Appellee,

and

Cajun Electric Power Cooperative, Inc., Intervenor-Plaintiff-Appellee,

and

UNITED STATES of America, thru Rural Electrification Administration (REA), Third Party-Defendant-Appellee.

Sept. 12, 1994.

Appeal from the United States District Court For the Western District of Louisiana.

Before POLITZ, Chief Judge, DAVIS and WIENER, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

This appeal revolves around a municipality's attempt to condemn equipment and electricity consumers within an area annexed by the municipality. South Louisiana Electric Cooperative Association (SLECA), the current electricity providers, along with their federal financier, the Rural Electrification Administration (REA), opposed the state-law expropriation and sought summary judgment. The district court found that the REA Administrator had authority under the Rural Electrification Act (REAct), 7 U.S.C. § 901 et seq., to withhold approval of the state-law expropriation so that the state-law expropriation was preempted under the Supremacy Clause, 837 F.Supp. 194. We affirm on the alternative ground that the state-law expropriation is preempted because it would frustrate a federal purpose.

I.

In January 1985, the City of Morgan City annexed a small suburban area containing approximately 252 electricity consumers. These electricity consumers were serviced by SLECA, a

rural power cooperative financed by the federal government under the REAct.[1] SLECA buys its power in bulk from Cajun Electric Power Cooperative (Cajun), also an REA-financed cooperative.[2] To secure their federal loans, SLECA and Cajun have mortgaged their assets to the REA.

After the annexation, Morgan City, which operates its own municipal utility,[3] offered to purchase all of SLECA's property in the area, including the exclusive right to provide power to electricity consumers in the area. When SLECA refused the offer, Morgan City brought this expropriation action pursuant to L.R.S. 19:101 et seq., seeking to condemn the disputed property rights.

Cajun intervened as a party defendant. The REA was joined as a third party defendant on the basis of its security interest in the property at issue and removed the case to federal court.

Thereafter, the REA Administrator filed into the record a signed declaration objecting to Morgan City's state-law expropriation on grounds that the expropriation would jeopardize the REA's ability to protect its loans and would cause substantial harm to the federal rural electrification program.

The Administrator asserted that the threatened expropriation would frustrate the federal rural electrification program for several reasons. First, the annexed area is the most heavily populated part of SLECA's service area and thus is the area SLECA is able to serve most economically and efficiently. Thus, the disputed area provides SLECA with its most profitable customers. According to the Administrator, loss of this area's customer load could jeopardize SLECA's financial health and result in a rate increase for SLECA's remaining customers. The Administrator contends that this danger is especially acute in light of the impact of future planned expropriations in the Morgan City area whose cumulative impact on SLECA's electric system would be devastating.

The Administrator further objected to the expropriation on grounds that the expropriation

---

[1]To date, SLECA has obtained 25 REA loans totalling over $38 million, $25 million of which is outstanding.

[2]To date, Cajun has obtained $3 billion in REA loans.

[3]Morgan City's utility system purchases its bulk supply from the Louisiana Energy and Power Authority and sells to its customers at a rate 157 lower than SLECA's.

could negatively affect not only SLECA, but the entire chain of REA-financed member cooperatives. Cajun provides power under wholesale contracts to twelve other REA-financed distribution cooperatives, which in turn distribute to rural electricity customers. Reduction in the volume of Cajun's distributions as a result of this and other state-law expropriations could increase the cost of Cajun's wholesale power. This increase in cost of electric power would be passed on to the entire rural area serviced by federally financed member distributor cooperatives.

The REA, joined by SLECA and Cajun, filed a motion to dismiss or, in the alternative, for summary judgment, arguing that Morgan City's expropriation action was preempted by the REAct. The district court granted the defendants' summary judgment motion and dismissed the expropriation. The court based its ruling on two conclusions: (1) the Administrator's determination that the expropriation would be contrary to the federal rural electrification program was not arbitrary and capricious; and (2) the REAct, 7 U.S.C. § 907, authorized the Administrator to withhold approval of the transfer even though the transfer was involuntary. The City of Morgan City appeals.

## II.

The federal government, when acting within the confines of its constitutional authority, is empowered to preempt state law to the extent necessary to achieve a federal purpose. U.S. Const. art. VI, cl. 2. The Supreme Court has explained that preemption of state law may occur in several different ways. *Louisiana Public Service Commission v. FCC,* 476 U.S. 355, 368-69, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986). First, Congress may expressly preempt state law. *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 203, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983). Second, Congress may legislate so comprehensively that it creates a "reasonable ... inference that Congress left no room for the States to supplement it." *Id.* at 204, 103 S.Ct. at 1722. Under such circumstances, where Congress intends that federal law "occupy the field"—i.e., be exclusive in the area, state law within the field is preempted. Third, state law is displaced to the extent that it conflicts with federal action. *Id.* This last breed of preemption, conflict preemption, may occur in two ways. First, a provision of state law may be incompatible with a federal statute such that compliance with both is a "physical impossibility." *Id.* Second, even if

compliance with both is not impossible, state law is nonetheless preempted if its application would disturb, interfere with, or seriously compromise the purposes of the federal statutory scheme. *Id.* In other words, an application of state law that would frustrate the purpose of a federal statutory scheme is preempted. *See id.* at 220-21, 103 S.Ct. at 1731.

In this case, we elect to turn directly to the applicability of the second variety of conflict preemption to the facts presented by the summary judgment evidence. *See United States v. Early,* 27 F.3d 140, 142 (5th Cir.1994) (court can affirm on an alternative basis). Accordingly, we save for another day the issue of whether 7 U.S.C. § 907 by its terms confers authority on the Administrator to withhold approval of an involuntary disposition, and instead consider only whether a conflict exists because the proposed state-law expropriation would frustrate a federal purpose.

Under the second variety of conflict preemption, Morgan City's expropriation may be preempted if the action would frustrate a federal purpose. Stated differently, state action is preempted if its effect is to discourage conduct that federal legislation specifically seeks to encourage. For example, in *Xerox Corp. v. County of Harris,* 459 U.S. 145, 103 S.Ct. 523, 74 L.Ed.2d 323 (1982), the Supreme Court held that a state tax could not be imposed on goods manufactured in Mexico, shipped to the United States, and held under bond in a customs warehouse awaiting shipment abroad. *Id.* at 154, 103 S.Ct. at 528. The Court found that a long history of federal legislation indicated a clear intent to create duty-free enclaves for such imported goods stored in this country pending export so as to encourage merchants to use American ports. *Id.* at 150-52, 103 S.Ct. at 525-27. The Court held that although a st ate tax on such goods was not expressly prohibited, its imposition was preempted because such a tax would manifestly discourage and financially penalize the very acts the federal law was meant to foster. In this vein, we therefore turn our attention in this case to the effect of the state-law expropriation on the federal legislation.

### 1. *The Goals of the REAct*

In 1936, Congress enacted the REAct for the purpose of ensuring that electric service would be provided to rural America. By enacting the legislation and creating the REA, Congress determined that the national interest would be served by subsidizing the rural user of electricity. Prior to the

REAct, rural areas which were thinly populated and had lower demand for electricity failed to attract investor-owned utilities for the obvious reason that providing service to these areas was costly and therefore unprofitable. *See, e.g., Tri-State Generation & Transmission Assn., Inc. v. Shoshone River Power, Inc.,* 874 F.2d 1346, 1348 (10th Cir.1989). The REA encouraged rural electrification by providing low interest insured loans and loan guarantees to cooperatives. 7 U.S.C. § 903; *see also Alabama Power Co. v. Alabama Electric Cooperative, Inc.,* 394 F.2d 672 (5th Cir.1968).

In response to the REAct, rural communities formed non-profit electric distribution cooperatives, such as SLECA, which were financed by the REA. After these REA-financed distribution cooperatives were formed, groups of cooperatives banded together to form central generation and transmission cooperatives (G & Ts) to obtain a less expensive, long-term source of power. To enable the formation of the G & Ts, the member distribution cooperatives entered into long-term wholesale power contracts with the G & Ts for electricity. *See, e.g., Tri-State,* 874 F.2d at 1348.

The REA's security for loans is limited to the physical assets of its borrowers and the revenue generated by its borrowers, the G & T's and the distribution cooperatives. Thus, the relationship among the G & Ts, distribution cooperatives and the REA is structured through these wholesale power contracts. This contract obligates a distribution cooperative, such as SLECA, to purchase all of its electric power over a fixed term from a G & T, such as Cajun. When lending money to a G & T, the REA requires the G & T to enter into wholesale power contracts with member distribution cooperatives. Likewise, when the REA lends money to distribution cooperatives, the REA requires those distribution cooperatives to enter into similar contracts with G & Ts. This arrangement ensures that REA G & T and distribution borrowers will be able to earn revenue sufficient to meet their costs, service their REA debt, and continue to provide permanent, low-cost electric service to rural areas. *Id.*

### 2. *Louisiana's Expropriation Statute*

Morgan City seeks to condemn property, and, more significantly, the right to service electricity consumers who are currently serviced by SLECA and Cajun under a wholesale power

contract. Louisiana's expropriation law provides generally that any Louisiana municipality may expropriate property whenever necessary for the public interest as determined by the governing authority of the municipality, or, in cases such as this, by the trial judge when the taking is contested. LSA-R.S. 19:102.

In this case, the critical question is whether Louisiana's expropriation law, as applied and interpreted, would frustrate the federal purpose underlying the REAct. We recognize that the Supreme Court has made clear that there is no litmus test for determining whether a particular application of state law would frustrate a federal purpose:

> This Court, in considering the validity of state laws in the light of ... federal laws touching the same subject, has made use of the following expressions: conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference. But none of these expressions provides an infallible constitutional test or an exclusive constitutional yardstick. In the final analysis, there can be no one crystal clear distinctly marked formula. Our primary function is to determine whether, under the circumstances of th[e] particular case, [state] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

We find the Ninth Circuit's opinion in *Pend Oreille* helpful and persuasive in answering the question before us. In *Pend Oreille,* the Ninth Circuit concluded that under the Supremacy Clause, a state municipal public utility could not condemn property owned by a federally subsidized utility because the condemnation would interfere with the federal purpose of the REAct. *Pend Oreille,* 417 F.2d 200, 201-02 (1969). The Ninth Circuit reasoned that the proposed condemnation of a portion of a federally subsidized rural electrification system, even if compensated for under state law, would impair Congress's objective of providing reliable, low-cost electricity to rural America. The court concluded that removal of the targeted portion of the system would weaken the remainder of the system and lessen its ability to function effectively:

> This is not an ordinary case because what is sought to be taken here is part of a system and even if the part taken is paid for, and if an award is made for the damage to the remaining portion, a question remains as to the capacity of the remaining portions of the system to function.... [I]f, as a result of the condemnation, the loans were paid in full, but the remaining portions of the system could not continue to operate with decent service and at decent rates, the Government would have been paid but the purpose of the Rural Electrification Act would have been frustrated.

*Id.* at 201. The Ninth Circuit concluded that, under these circumstances, "a state [condemnation] law

written so that a state-favored utility can by its unilateral action interfere with the federal purpose cannot stand under the Supremacy Clause." *Id.* at 202.

A panel of this court followed *Pend Oreille's* reasoning in an analogous case, *City of Madison v. Bear Creek Water Ass'n, Inc.,* 816 F.2d 1057 (5th Cir.1987). In *Bear Creek,* we barred a municipal utility's proposed condemnation of a densely populated portion of a federally subsidized rural water utility. In reaching this conclusion, the *Bear Creek* court reasoned that:

> Even if fair value is paid for the lost facilities, such an action would inevitably have an adverse effect on the remaining customers ..., in the form of lost economies of scale and resulting higher per-user costs. To allow expanding municipalities to "skim the cream" by annexing and condemning those parts of a water association with the highest population density (and thus the lowest per-user cost) would undermine Congress's purpose of facilitating inexpensive water supplies for farmers and other rural residents and protecting those associations' ability to repay their FmHA debts.

*Bear Creek,* 816 F.2d at 1060 (citing *Big Bend,* 618 F.2d 601).

Morgan City argues that the relatively small number of SLECA consumers subject to this expropriation action distinguishes this case from both *Pend Oreille* and *Bear Creek.* But 252 users in a densely populated area is significant, obviously enough to attract Morgan City's interest in providing electric service to the area. Here, as in *Bear Creek,* a municipally-owned utility seeks to condemn an economically profitable service area developed through federal financing. The state law authorizing the condemnation takes no account of the potential prejudice to rural electricity consumers served by federally funded cooperatives. Permitting Morgan City to condemn these 252 users would pave the way for piecemeal erosion of other high-density service areas adjacent to Morgan City and other cities. Such action could well leave federally funded cooperatives financially unable to continue service to the remaining low-density areas not targeted by municipally-owned or investor-owned utilities. And we do not consider this concern hypothetical in light of the evidence in the record of future proposed annexations in the Morgan City area, as well as the Houma, Louisiana area. *See Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 130-31, 98 S.Ct. 2207, 2216, 57 L.Ed.2d 91 (1978) (hypothetical conflict not sufficient to warrant preemption). The REA's conclusion that this attempted condemnation would jeopardize the federal rural electrification program is amply supported by the record.

Were Morgan City's expropriation action allowed to stand, it would "stand as an obstacle" to the repayment of federal loans, to the financial viability of federally financed electricity cooperatives, and ultimately, to the maintenance of electricity service to rural areas. *See Hines,* 312 U.S. at 67, 61 S.Ct. at 404. As the Ninth Circuit noted, "Congress has declared the federal purpose to electrify the American farm. No matter how we characterize the vehicle which gets the electricity there, a state law so written that a state favored utility can by its unilateral action interfere with the federal purpose cannot stand under the Supremacy Clause of the Constitution of the United States." *Pend Oreille,* 417 F.2d at 202.

Because we find that the proposed state-law condemnation would frustrate the federal purpose of providing low-cost, reliable electric service to rural areas, the state-law condemnation proceeding is preempted under the Supremacy Clause. We therefore affirm the district court's dismissal of that action.

AFFIRMED.