**CITY OF STILWELL, OKLAHOMA,**
**Plaintiff,**

v.

**OZARKS RURAL ELECTRIC COOPERA-**
**TIVE CORP.; United States of America**
**ex rel. Rural Electrification Administra-**
**tion; and National Rural Utilities Coop-**
**erative Finance Corp., Defendants.**

No. 94–293–S.

United States District Court,
E.D. Oklahoma.

Nov. 4, 1994.

Lloyd E. Cole, Jr., Stilwell, OK, for plaintiff.

Larry Derryberry and Patrick D. Shore, Oklahoma City, OK, and John R. Eldridge, III, Fayetteville, AR, for Ozarks.

Susan Brandon, Asst. U.S. Atty., Muskogee, OK, and Douglas J. Hughes, U.S. Dept. of Justice, Washington, DC, for U.S.

Patrick D. Shore and John R. Eldridge, III, Oklahoma City, OK, and Cynthia L. Garegnani, Asst. Gen. Counsel, Herndon, VA, for National.

## ORDER

SEAY, Chief Judge.

This matter comes before the court on the motion for summary judgment filed by Ozarks Electric Cooperative Corporation ("Ozarks"). In its motion, Ozarks asserts that the attempted state law expropriation of its property by the City of Stilwell ("the City") is preempted under the Supremacy Clause of the United States Constitution because such expropriation would frustrate the purpose of the Rural Electrification Act ("REAct"), 7 U.S.C. § 901 et seq. The City has filed its response arguing for the application of the Oklahoma condemnation statutes. Neither the United States of America ex rel Rural Electrification Administration ("REA") nor the National Rural Utilities Cooperative Finance Corporation ("National") has taken a position in response to the City's motion. The REA has, however, filed with the court its September 20, 1994, Recommendation to the Administrator, which is the REA's final administrative decision concerning the City's proposed expropriation of Ozarks' facilities. Defendant United States' Notice of Administrative Decision (Docket No. 25, filed September 23, 1994). In its decision, the REA recommends that the Administrator not exercise his discretionary authority under section 907 of the REAct to withhold approval of the City's state law expropriation.

### I.

On April 4, 1994, the City, a municipal corporation of the State of Oklahoma, filed an amended petition for condemnation and injunctive relief in the District Court of

Adair County, Oklahoma, against Ozarks, REA and National.[1] Ozarks is an REA-financed rural distribution cooperative providing electrical power to its customers, including some who are located within the City's corporate boundaries. The City, which operates its own electrical transmission system for the benefit of its inhabitants, seeks to exercise its rights under Oklahoma law to condemn certain facilities and electricity consumers of Ozarks within an annexed portion of the City's corporate boundaries.[2] The City also seeks injunctive relief against Ozarks preventing it from extending or expanding its electrical facilities into the existing boundaries of the City. The REA and National have provided financing for Ozarks' operations and they are joined as defendants in this action because Ozarks, in order to secure such loans, has mortgaged its assets to them.[3]

## II.

Ozarks is one of many nonprofit electric distribution cooperatives formed in response to the passage of the REAct in 1936. Congress enacted the REAct to counter the refusal of existing utilities to provide electric services to consumers in rural areas. The prevalent practice in the industry was to "skim off the cream" of the electric business in the densely populated areas of the country and leave the more remote areas without service. As a simple matter of economies of scale, existing utilities refused to extend electric service to rural America because it was costly and therefore unprofitable. The REAct was a direct response to this existing industry practice and it is the legislative

mechanism which makes electric power available to rural America. Under the REAct, the REA was created and authorized to provide long-term, low interest loans to distribution cooperatives such as Ozarks to accomplish the objective of providing reliable electric service at affordable rates to rural communities across the country.

To enhance their ability to secure affordable, long-term electric power, distribution cooperatives banded together to form central generation and transmission cooperatives ("G & Ts"). The member distribution cooperatives and the G & Ts enter into long-term wholesale power contracts, or all-requirements contracts which provide that the members will purchase and receive from the G & Ts all or a portion of that particular member's energy requirements. This cooperative structure and the use of all-requirements contracts significantly foster the achievement of the central goals of the REAct:

> [w]ith the all-requirements contracts in place, the G & T system provided a stable, interdependent network whereby the distribution cooperatives could pool their resources and band together to obtain power at wholesale prices, build central facilities, obtain favorable loans, and attempt to keep costs down.

*Tri–State Generation & Transmission Association v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1349 (10th Cir.1989). Ozarks is a member of KAMO Electric Cooperative Inc. ("KAMO"), a nonprofit G & T comprised of seventeen distribution cooperatives. Pursuant to wholesale power contracts extending

---

1. The REA timely removed this action to this court on May 16, 1994. On June 28, 1994, the court denied the City's motion to remand.

2. Oklahoma's expropriation statute, 18 O.S. § 437.2(k) provides, in pertinent part:

   ... and provided further that if such city, town or village in which an area has been or shall be included, as aforesaid, owns and operates a system for the furnishing of electric energy to its inhabitants, the cooperative furnishing electric energy in such area shall transfer to such city, town or village, upon its request, the cooperative's electric distribution facilities used in furnishing electric energy in said area, ... The city, town or village shall pay to the

cooperative an amount to compensate the cooperative for the fair value of the cooperative's facilities to be acquired by the city, town or village.

The remainder of section 437.2(k) outlines the procedure to be utilized when the parties cannot agree on the amount to be paid the cooperative. This includes the filing of an action in district court and resorting to the procedures for ascertaining just compensation provided in Article 2, of the Oklahoma Constitution and sections 53 to 58, inclusive, of title 66 of the Oklahoma statutes.

3. The REA's administrative decision reflects that Ozarks has a total outstanding debt to the REA of approximately $26 million. Ozarks' outstanding debt to National is approximately $9 million.

through the year 2020, KAMO supplies electric power to its members who, in turn, provide retail electric power to customers in northeastern Oklahoma and southwestern Missouri.

The proposed expropriation by the City will financially impact both Ozarks and KAMO and, as a result, the integrated G & T system. By its actions, the City is attempting to "skim the cream" of Ozarks' most profitable consumers. As noted by the REA in its administrative decision:

> Stilwell is seeking to obtain some of the highest density portions of Ozarks' Oklahoma service area. It is also the most economical and efficient part of the system and it provides Ozarks with a disproportionate share of its system margins (profits) ...
>
> . . . . .
>
> Ozarks has provided information which indicates that, although the 154 consumers proposed to be taken by Stilwell represent only 1.55 percent of the total 9,935 Oklahoma consumers, they represent a disproportionately high 9.32 percent of state total kWh sales, 6.57 percent of state total revenue and 6.97 percent of the state total operating margins. This indicates that the facilities and consumers being condemned represent some of Ozarks' highest density and highest margin-producing service area. This proposed "skimming the cream" by Stilwell will thus result in the remaining consumers in Oklahoma having to make up the difference by paying higher retail sales rates for the electric service they receive.

Administrative Decision, pp. 8, 10 and 11. After considering the impact the proposed expropriation would have on its security interests and on Ozarks' financial viability, the REA concluded that any adverse impact would be minimal and insufficient to recommend that the Administrator exercise his rights under section 907 of the REAct to withhold approval of the proposed expropriation. Administrative Decision, p. 15. In a more global sense, however, the REA did recognize that as a result of the proposed expropriation:

> another benefit of the rural development efforts by Ozarks will not be realized since this action could discourage future rural development efforts by Ozarks and frustrate a congressionally mandated REA goal, to enhance the economic well being and growth of the rural community.

Administrative Decision, p. 10.

Given the structure of the integrated G & T system, the City's proposed expropriation would also impact KAMO's revenues and costs. The reduction in Ozarks' demand for electricity caused by the proposed expropriation would represent a loss of less than 1% of KAMO's member revenue. The increase in costs necessarily flowing from this lost revenue would be passed on to KAMO's members in both Oklahoma and Missouri. Administrative Decision, p. 8.

### III.

■ Congress has the power to preempt state law under the Supremacy Clause of Article VI of the Constitution. The burden of establishing preemption is on Ozarks, who must show that state law providing for expropriation of its facilities and consumers is preempted by the REAct. *See Arkansas–Platte & Gulf v. Van Waters & Rogers,* 959 F.2d 158, 161 (10th Cir.), *vacated on other grounds,* —— U.S. ——, 113 S.Ct. 314, 121 L.Ed.2d 235 (1992) (the burden is on the defendants to show that state tort claims based on failure to warn are preempted by the Federal Insecticide, Fungicide, and Rodenticide Act). Congressional action[4] may give rise to preemption in several different ways: (1) Congress may express a clear intent to preempt state law, *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309–10, 51 L.Ed.2d 604 (1977); *Louisiana Public Serv. Comm'n v. FCC,* 476 U.S. 355, 368, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986); (2) Congress may choose to occupy a particular field by legislating in such a comprehensive manner that a reasonable infer-

---

4. Although not applicable to the facts of this case, a federal agency acting within the scope of its congressionally delegated authority may also preempt state law. *Fidelity Federal Savings &* *Loan Assn. v. de la Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982); *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984).

ence can be made that Congress intended to remove the area from state regulatory authority, *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 203–04, 103 S.Ct. 1713, 1721–22, 75 L.Ed.2d 752 (1983); *Evans v. Board of County Com'rs*, 994 F.2d 755, 761 (10th Cir.1993); and (3) preemption may be inferred where state and federal law conflict, *Pacific Gas & Electric Co.*, 461 U.S. at 204, 103 S.Ct. at 1722. This last area of conflict preemption may occur when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), when federal law implies a barrier to state regulation, *Louisiana Pub. Serv. Comm'n*, 476 U.S. at 368, 106 S.Ct. at 1898 (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)), or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

█ In its motion before the court, Ozarks relies on this last category of conflict preemption by arguing that the City's proposed expropriation "frustrates the federal purpose of the REAct" of providing low cost, reliable electric service to rural America. In support of its argument, Ozarks submits the Fifth Circuit Court of Appeals' recent decision in *Morgan City v. South Louisiana Elec. Co-op*, 31 F.3d 319 (5th Cir.1994).[5] In *Morgan City*, the Fifth Circuit determined that Louisiana's condemnation statute was preempted under the Supremacy Clause because application of the statute would frustrate the federal purpose underlying the REAct. The facts of *Morgan City* are strikingly similar to the facts in the instant case. In 1985, Morgan City annexed a small suburban area consisting of 252 electricity consumers, who were serviced by defendant South Louisiana Elec-

tric Cooperative Association ("SLECA"), an REA-financed rural power cooperative. After annexation, and after a failed attempt to purchased SLECA's property, Morgan City filed a condemnation action against SLECA. Louisiana's expropriation statute provides generally that a Louisiana municipality may expropriate property whenever the municipality determines it is necessary for the public interest, or, in contested cases, when the trial judge makes such determination. Relying on this statute, Morgan City attempted to condemn SLECA's facilities and electricity consumers within the annexed area.

SLECA, joined by the REA and Cajun Power Electric Cooperative ("Cajun"), an REA-financed G & T, sought summary judgment on the basis that Morgan City's expropriation was preempted by the REAct. In granting summary judgment and dismissing the expropriation, the district court relied upon the REA's discretionary authority under section 907 of the REAct to withhold approval of state law expropriations which would thwart the explicit congressional purpose of the REAct. On appeal, the Fifth Circuit affirmed, but on alternative grounds. The Fifth Circuit did not rely on the fact that the REA had exercised its discretionary authority under section 907, but rather, it held that Morgan City's attempt to expropriate SLECA's property under Louisiana law was preempted because it would frustrate a federal purpose. *Id.* at 321.

The court finds the reasoning of the Fifth Circuit in *Morgan City* sound and persuasive. Given the substantial similarity between the facts in *Morgan City* and the facts herein, the court is convinced that the City's expropriation under Oklahoma law likewise "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" under the REAct. *Hines*, 312 U.S. at 67, 61 S.Ct. at 404. To allow the

---

5. *Morgan City* and the case it relied on, *Public Utility District No. 1 of Pend Oreille County v. United States of America*, 417 F.2d 200 (9th Cir. 1969), are the only federal cases cited by either party which address issues similar to those presented herein. The court's independent research failed to uncover any other federal court decisions analyzing the interplay between the opera-

tion of the REAct and state condemnation actions involving the property of REA-financed cooperatives. The parties have informed the court and the record reflects that the instant action is the first case of a municipality attempting to condemn a rural electric cooperative's facilities in the State of Oklahoma.

City to condemn the subject portion of Ozarks' rural electrification system would frustrate the federal objective of providing reliable, low cost electricity to rural America. The City's attempt to "skim the cream" jeopardizes the efficient operation of the subject integrated system. While the City's action would not serve as the death knell for the continued viability of the system, it would undoubtedly "disturb, [and] interfere with, .. the purposes of the federal statutory scheme." *Morgan City*, 31 F.3d at 322 (citing *Pacific Gas*, 461 U.S. at 204, 103 S.Ct. at 1722). As observed by the Fifth Circuit in the related context of a municipality's proposed expropriation of a densely populated portion of a federally subsidized rural water utility:

> Even if fair value is paid for the lost facilities, such an action would inevitably have an adverse effect on the remaining customers ..., in the form of lost economies of scale and resulting higher per-user costs. To allow expanding utilities to "skim the cream" by annexing and condemning those parts of a water association with the highest population density (and thus the lowest per-user cost) would undermine Congress's purpose of facilitating inexpensive water supplies for farmers and other rural residents and protecting those associations' ability to repay their FmHA debts.

*City of Madison v. Bear Creek Water Ass'n, Inc.*, 816 F.2d 1057, 1060 (5th Cir.1987) (citing *Public Utility District No. 1 of Franklin County v. Big Bend Electric*, 618 F.2d 601 (9th Cir.1980)). Thus, the court concludes

that the City's proposed expropriation of Ozarks' facilities and consumers would frustrate the federal purpose of the REAct and it is therefore preempted under the Supremacy Clause of the Constitution.[6]

■ The court makes this determination notwithstanding the fact that the REA has declined to oppose the taking under the provisions of section 907 of the REAct.[7] The administrator's decision to decline to exercise his discretionary authority under section 907 may be influenced by many factors, including operational, fiscal, and other constraints which do not necessarily have any direct, or indirect, bearing on the facilitation of the goals underlying the REAct. As a result, the administrator's decision not to oppose the proposed expropriation by the City is not the equivalent of a determination that the application of Oklahoma's expropriation statute would not frustrate the purpose underlying the REAct. Indeed, in its decision, the REA voiced much concern over the City's proposed expropriation and the consequences flowing not only from this particular taking, but from any contemplated future expropriations. Consequently, the court finds that it is not compelled to adopt the ultimate decision of the REA as its decision regarding the determination of whether the condemnation proceeding is preempted under the Supremacy Clause of the Constitution.

## IV.

Because the proposed expropriation of Ozarks' facilities and consumers would frustrate the federal purpose underlying the

---

6. In a supplemental brief, the City directs the court's attention to three Supreme Court cases, *Arkansas Electric Co-op Corp. v. Arkansas Public Service Commission*, 461 U.S. 375, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983), *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), and *Pacific Gas*, for the proposition that the "frustration doctrine" has been narrowly confined to situations in which a clear and definitive policy choice has been made by Congress to forbid state regulation. The City contends that absent such a clear directive courts should not attempt to satisfy the goals of the federal statutory scheme "at all costs." In other words, when there are alternative measures available to achieve stated federal goals courts should be hesitant to invoke preemption. The court has reviewed the cited cases and finds no

departure from the Supreme Court's long standing application of the "frustration doctrine" in situations where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67, 61 S.Ct. at 404. The court does not interpret the cited authority as requiring it to make a foundational determination that Congress has expressly forbidden state regulation or that alternative measures are unavailable before conflict preemption can be invoked.

7. Also, the REA's decision not to oppose the City's action does not preclude Ozarks from asserting preemption. *See Arkansas–Platte & Gulf*, 959 F.2d at 159–64, *vacated on other grounds*, —— U.S. ——, 113 S.Ct. 314, 121 L.Ed.2d 235 (1992).

REAct, the City's condemnation proceeding is preempted under the Supremacy Clause of the Constitution. Ozarks' motion for summary judgment is granted.

**IT IS SO ORDERED.**