79 F.3d 1038
 34 Fed.R.Serv.3d 954, Util. L. Rep. P 14,098
 CITY OF STILWELL, OKLAHOMA, a municipal corporation,
Plaintiff-Appellant,
v.
OZARKS RURAL ELECTRIC COOPERATIVE CORPORATION; Rural
Electrification Administration, United States of
America; National Rural Utilities
Cooperative Finance
Corporation,
Defendants-Appellees,
KAMO Electric Cooperative, Inc., Movant-Appellant,
Tahlequah Public Works Authority; Municipal Electric Systems
of Oklahoma, Inc.; American Public Power Association;
National Institute of Municipal Law Officers; National
League of Cities; United States Conference of Mayors;
Colorado Association of Municipal Utilities; The Colorado
Rural Electrification Association; National Rural Electric
Cooperative Association, Amici Curiae.
 Nos. 94-7135, 95-7011.
 United States Court of Appeals,
Tenth Circuit.
 March 28, 1996.
 
 Appeal From The United States District Court For The Eastern District Of Oklahoma (D.C. No. CV-94-293); Frank H. Seay, Judge.
 
 
 1
 Lloyd E. Cole, Jr., Stilwell, Oklahoma, for Plaintiff-Appellant.
 
 
 2
 John R. Eldridge, III of Burke & Eldridge, P.A., Fayetteville, Arkansas (Larry Derryberry, Patrick D. Shore of Derryberry, Quigley, Parrish, Solomon & Blankenship, Oklahoma City, Oklahoma, with him on the brief), for Defendant-Appellee Ozarks Rural Electric Cooperative Corporation.
 
 
 3
 Mark B. Stern, Thomas M. Bondy, Attorneys, Appellate Staff, Civil Division, Department of Justice, Washington, D.C., for Defendant-Appellee Rural Electrification Administration, United States of America.
 
 
 4
 Jot Hartley of Hartley & Jones, Vinita, Oklahoma (Joseph M. Gardner of Hartley & Jones, Vinita, Oklahoma, and Clifford K. Cate, Muskogee, Oklahoma, with him on the brief), for Movant-Appellant KAMO Electric Cooperative, Inc.
 
 
 5
 Harvey L. Chaffin, Karig P. Culver, of Chaffin, Culver & Chapman-Plumb, Tahlequah, Oklahoma, Ronald A. Bloch, Martha A. Hausman, Lisa S. Derman, of McDermott, Will & Emery, Washington, D.C., for Tahlequah Public Works Authority, and Municipal Electric Systems of Oklahoma, Inc., Amici Curiae.
 
 
 6
 Clifton S. Elgarten, Amy J. Mauser, of Cromwell & Moring, Washington, D.C., for American Public Power Association, National Institute of Municipal Law Officers, National League of Cities, and United States Conference of Mayors, Amici Curiae.
 
 
 7
 Paula M. Connely of Gorsuch Kirgis L.L.C., Denver, Colorado, Joseph B. Wilson, Colorado Springs, Colorado, for Colorado Association of Municipal Utilities, Amicus Curiae.
 
 
 8
 John J. Conway, Denver, Colorado, Randolph W. Starr, Loveland, Colorado, Jack P. Wolfe, Longmont, Colorado, for Colorado Rural Electric Association, Amicus Curiae.
 
 
 9
 Wallace F. Tillman, Jonathan H. Glazier, National Rural Electric Cooperative Association, Washington, D.C., James A. Orr of Sutherland, Asbill & Brennan, Atlanta, Georgia, for National Rural Electric Cooperative Association, Amicus Curiae.
 
 
 10
 Before BALDOCK, BRORBY and KELLY, Circuit Judges.
 
 
 11
 PAUL KELLY, Jr., Circuit Judge.
 
 
 12
 These appeals concern an action by the City of Stilwell, Oklahoma ("Stilwell" or "City") to condemn the electric facilities and service rights of Defendant-Appellee Ozarks Rural Electric Cooperative Corporation ("Ozarks") within an area annexed by the City. The district court granted summary judgment in favor of Ozarks, preventing Stilwell's proposed condemnation on the ground that the state condemnation statute, Okla. Stat. Ann. tit. 18, 437.2(k), was preempted under the Supremacy Clause, U.S. Const. art. 6, cl. 2, because it frustrated the purpose of the Rural Electrification Act, 7 U.S.C. §§ 901 to 950aa-1. ("REAct"). City of Stilwell v. Ozarks Rural Elec. Coop. Corp., 870 F.Supp. 1025, 1030-31 (E.D.Okla.1994). The district court also denied appellant KAMO Electric Cooperative's ("KAMO") motion to intervene. KAMO Br., ex. A. Our jurisdiction arises under 28 U.S.C. § 1291. We reverse the district court's grant of summary judgment and affirm the denial of KAMO's motion to intervene.
 
 I.
 
 13
 Plaintiff-appellant City of Stilwell is a municipality located in Adair County, Oklahoma. It owns and operates an electrical system used to provide electric power to its inhabitants. The City uses the revenue it generates from the electrical system to finance a variety of other municipal services, including sewer, water, street, police, fire, and recreational services. Aplt. Br. at 3. In recent years, Stilwell has undergone a period of expansion, and it has annexed certain outlying areas and incorporated them into the City.
 
 
 14
 Included among the areas recently annexed by Stilwell is a section which includes 154 consumers serviced by Ozarks. These 154 consumers represent 1.55 percent of Ozarks' total consumers in Oklahoma, and 9.32 percent of Ozarks' electric sales revenue in the state. Aplee. App. 11. Ozarks is an Arkansas corporation, which was granted an exclusive right to furnish electric service to customers in its territory under the Oklahoma Rural Electric Supplier Certified Territory Act, Okla. Stat. Ann. tit. 17, 158.25(A). Ozarks receives funding from the Rural Electrification Administration ("REA"),[1] which was created by the REAct to provide financing to power suppliers as an inducement to provide economical electric power to rural America.
 
 
 15
 When Stilwell annexed the portion of land within Ozarks' exclusive territory, it sought to have Ozarks transfer its facilities and service rights in the annexed area to the City, under the procedure prescribed by the Oklahoma Rural Electric Cooperative Act, Okla. Stat. Ann. tit. 18, 437 ("OREC Act"). Under 437.2(k):
 
 
 16
 if such city, town or village in which an area has been or shall be included, as aforesaid, owns and operates a system for the furnishing of electric energy to its inhabitants, the cooperative furnishing electric energy in such area shall transfer to such city, town or village upon its request, the cooperative's electric distribution facilities used in furnishing electric energy in said area....
 
 
 17
 The state's grant of an exclusive territory to Ozarks foresaw the possibility that the territory could be annexed by Stilwell. Okla. Stat. Ann. tit. 17, 158.28 specifically provides that:
 
 
 18
 nothing in this act shall prohibit or shall ever be construed to prohibit any municipal corporation ... owning or operating electric lines, from furnishing electric service to any territory thereafter annexed and incorporated into the corporate limits of said municipal corporation, or from acquiring the electric distribution facilities of any association or cooperative corporation as now provided in Title 18, Section 437.2.
 
 
 19
 Ozarks received its grant of certified territory fully informed that it was subject to a limitation--that if a certified territory "is annexed to and becomes part of an incorporated city or town, the certification of such territory ... shall be null and void." Okla. Stat. tit. 17, 158.29.
 
 
 20
 When Stilwell approached Ozarks to agree on a "fair price" to compensate Ozarks for the condemnation, Okla. Stat. tit. 18, 437.2(k), Ozarks refused to negotiate. Stilwell then instituted a state court action to force Ozarks to agree to transfer its facilities and service rights for the annexed area to the City for a fair price under the OREC Act. Stilwell joined the United States as an indispensible party defendant on the basis of the United States' interest in Ozarks' property as security against Ozarks' indebtedness to the REA. See 28 U.S.C. § 2410(a)(4). The United States removed the case to federal court. See Aplt.App. tab 2. The REA later announced in an administrative decision that it would not oppose the proposed taking, describing its effects as "minimal." Aplee. App. 14.
 
 
 21
 Ozarks subsequently filed a motion for summary judgment, urging that Okla. Stat. tit. 18, 473.2(k) is unconstitutional and is preempted because it frustrates the purpose of the REAct. Aplt.App. tabs 6, 7. The trial court granted summary judgment, holding that "[b]ecause the proposed expropriation of Ozarks' facilities and consumers would frustrate the federal purpose underlying the REAct, the City's condemnation proceeding is preempted under the Supremacy Clause of the Constitution." City of Stilwell, 870 F.Supp. at 1030-31. We disagree.II.
 
 
 22
 In No. 94-7135, KAMO appeals the district court's denial of its motion to intervene in the action pursuant to Fed.R.Civ.P. 24. KAMO is a non-profit rural generation and transmission cooperative which is owned by its seventeen member distribution cooperatives, including Ozarks. KAMO, like Ozarks, is financed by the REA, and it supplies electric power to its member cooperatives at wholesale rates. KAMO's sales of power to Ozarks represent approximately 4.4% of KAMO's total sales to its member cooperatives, and about 8% of its Oklahoma revenues.
 
 
 23
 KAMO argues that the district court erred in denying its motion to intervene as of right under Fed.R.Civ.P. 24(a)(2) or, in the alternative, for permissive intervention under Fed.R.Civ.P. 24(b)(2). Our review of rulings on motions to intervene as of right is de novo, Alameda Water & Sanitation Dist. v. Browner, 9 F.3d 88, 90 (10th Cir.1993), and we review a denial of permissive intervention for abuse of discretion, id. at 89-90 (citing Allen Calculators, Inc. v. National Cash Register Co., 322 U.S. 137, 142, 64 S.Ct. 905, 907, 88 L.Ed. 1188 (1944)).
 
 A.
 
 24
 Under Fed.R.Civ.P. 24(a)(2), a party may intervene as a matter of right:
 
 
 25
 when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.
 
 
 26
 Therefore, to intervene as a matter of right, KAMO must demonstrate that Ozarks cannot represent its interest adequately, and that disposition of the action without KAMO's presence will impair KAMO's ability to protect its interest. Kiamichi R.R. Co. v. National Mediation Bd., 986 F.2d 1341, 1345 (10th Cir.1993). We find that KAMO lacks the requisite interest in the action as required by Rule 24(a)(2), and that any interest KAMO does have is adequately represented by Ozarks.
 
 
 27
 To intervene as a matter of right, KAMO must show it has an interest in the proceedings which is " 'direct, substantial, and legally protectable.' " Browner, 9 F.3d at 90 (quoting United States v. Perry County Bd. of Educ., 567 F.2d 277, 279 (5th Cir.1978)). Essentially, KAMO claims a property interest in the subject of the litigation by virtue of its financial ties to Ozarks; KAMO argues that the condemnation of Ozarks' territory by Stilwell will lead to increased costs to KAMO's remaining consumers. KAMO contends that while they admittedly have no legal title to Ozarks' distribution system, "KAMO does have a property right and financial interest in the service agreements and revenue stream between Ozarks and its member consumers." KAMO Br. at 9. However, KAMO's interest is not in the distribution facilities themselves, nor is it in the revenues Ozarks will derive from its customers in Stilwell. KAMO merely has a contingent interest in the subject of the lawsuit--KAMO, as Ozarks' supplier of electric power, will benefit financially if Ozarks is allowed to continue to service its customers in Stilwell. An interest of this sort is too attenuated and does not satisfy the "direct and substantial" requirement of Rule 24(a)(2). See Washington Elec. Coop. v. Massachusetts Mun. Wholesale Elec. Co., 922 F.2d 92, 97 (2d Cir.1990) (denying intervention on grounds that intervenor could not satisfy Rule 24(a)(2) by claiming a contingent interest in payments made from plaintiff to defendant).
 
 
 28
 Even if KAMO established a direct and substantial interest in the subject of the litigation, KAMO has not demonstrated that its interest is inadequately represented by Ozarks. While KAMO's ultimate motivation in this suit may differ from that of Ozarks, its objective is identical--to prevent Stilwell's condemnation. We held that representation is adequate "when the objective of the applicant for intervention is identical to that of one of the parties." Bottoms v. Dresser Indus., Inc., 797 F.2d 869, 872 (10th Cir.1986); see also Kiamichi, 986 F.2d at 1345. In Bottoms, the intervenor claimed a fifty-percent partnership interest in a patent held by the plaintiff that was the subject matter of the litigation. We found that the plaintiff had an "overwhelming interest" in seeking the greatest possible recovery in the action, and that the applicant had "an identical interest and motivation." Bottoms, 797 F.2d at 872. Therefore, absent "a concrete showing of circumstances ... that make [the existing party's] representation inadequate," intervention should be denied. Id. In the present appeal, KAMO has made no such showing. The district court properly denied KAMO's motion to intervene as of right under Fed.R.Civ.P. 24(a)(2).
 
 B.
 
 29
 Alternatively, KAMO moves for permissive intervention under Fed.R.Civ.P. 24(b)(2). Under Rule 24(b)(2), "anyone may be permitted to intervene ... when an applicant's claim or defense and the main action have a question of law or fact in common." While this standard is, aptly, "permissive," it is also "a matter within the district court's discretion, and we will not reverse the district court's ruling absent a clear abuse of discretion." Kiamichi, 986 F.2d at 1345.
 
 
 30
 The district court denied KAMO's request for permissive intervention by minute order, stating:
 
 
 31
 (1) the constitutional concerns asserted by KAMO in their proposed answer can be adequately represented by the existing defendants and (2) intervention would unduly delay and prejudice the adjudication of the rights of the parties as KAMO attempts to interject additional issues in its proposed answer related to a determination of damages it has, or will, incur as a result of the expropriation of Ozarks' facilities.
 
 
 32
 KAMO App. tab 6. We do not find that the district court abused its discretion in denying KAMO's request for permissive intervention. KAMO argues that we should be persuaded by the district court's grant of the application to intervene by Cajun Electric Power Cooperative in City of Morgan City v. South Louisiana Elec., 837 F.Supp. 194, 195 (W.D.La.1993). The argument is unavailing, however, given our standard of review. The fact that the trial court in Morgan City, in its discretion, may have granted permissive intervention under similar circumstances, does not change our decision that the trial court in the present case acted within its discretion in denying permissive intervention.
 
 III.
 
 33
 In No. 95-7011, Stilwell appeals the district court's grant of Ozarks' motion for summary judgment. Our review is de novo and we apply the same legal standard used by the district court in evaluating the summary judgment motion, namely Fed.R.Civ.P. 56(c). Universal Money Ctrs., Inc. v. AT & T, 22 F.3d 1527, 1529 (10th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 655, 130 L.Ed.2d 558 (1994). Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).
 
 A.
 
 34
 The crux of Ozarks' contention is that 437.2(k) of the OREC Act, under which Stilwell seeks to force Ozarks to transfer its electric energy facilities for the annexed territory, is preempted by the REAct, 7 U.S.C. §§ 901-950aa-1. The Supremacy Clause provides that the "Laws of the United States ... shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Federal preemption of state law can occur in various ways. First, Congress may preempt state law by the explicit language of a federal statute. Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n, 461 U.S. 190, 203, 103 S.Ct. 1713, 1721, 75 L.Ed.2d 752 (1983). Second, Congress may "occupy a field" by enacting legislation so comprehensive that " 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' " Id. at 204, 103 S.Ct. at 1722 (quoting Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982)). Finally, "[e]ven where Congress has not entirely displaced state regulation in a specific area, state law is preempted to the extent that it actually conflicts with federal law." Id. "Conflict" preemption can occur where compliance with both federal and state law is impossible, or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id. (quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). This case involves the second type of conflicts preemption, specifically whether application of state law will frustrate the purpose of a federal statutory scheme.
 
 B.
 
 35
 Congress enacted the Rural Electrification Act of 1936 to facilitate the extension of electric service to rural America. See Tri-State Generation & Transmission Assoc. v. Shoshone River Power, Inc., 874 F.2d 1346, 1348 (10th Cir.1989). The REAct created the REA and empowered it to make and guarantee low interest loans for purposes of rural electrification. Id. The REAct did not, however, confer regulatory powers upon the REA; "the REA is a lending agency rather than a classic public utility regulatory body." Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n, 461 U.S. 375, 386, 103 S.Ct. 1905, 1913, 76 L.Ed.2d 1 (1983). In fact, the Supreme Court specifically stated that "the legislative history of the [REAct] makes abundantly clear that, although the REA was expected to play a role in assisting the fledgling rural power cooperatives in setting their rate structures, it would do so within the constraints of existing state regulatory schemes." Id.
 
 
 36
 While Arkansas Electric deals with the REA's ability to preempt rate regulation by the States, the Supreme Court's reasoning and interpretation of the role of the REA and the scope of the REAct is equally applicable to the issue of preemption of state statutes authorizing the creation of rural electric cooperatives which impose certain service conditions to ensure orderly growth and avoid duplication of facilities. Just as the Supreme Court found no explicit preemption of state rate regulation in the REAct, id. at 384-85, 103 S.Ct. at 1912-13, there is similarly no express language which preempts state statutory schemes such as exist in Oklahoma. Given the fact that "the regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States," id. at 377, 103 S.Ct. at 1908, we are not inclined to read the REAct so broadly as to expand the REA's authority beyond that which is "merely derivative of the Administrator's responsibilities for the operation of the loan and guarantee programs under the REAct." Wabash Valley Power Ass'n v. REA, 988 F.2d 1480, 1489-90 (7th Cir.1993).
 
 
 37
 Ozarks agrees that the primary purpose of the REAct is to "electrify rural America at affordable rates and with area coverage." Ozarks Br. at 12 (citing Public Utility Dist. No. 1 of Pend Oreille County v. United States, 417 F.2d 200, 201 (9th Cir.1969)). Ozarks contends further, however, that "[t]his purpose ... encompasses assurances that what is left after a proposed condemnation will be able to efficiently and economically continue its mission of providing reliable, low priced electric service in rural America." Ozarks Br. at 14. We cannot adopt this expansive interpretation. As defined by the REAct, " 'rural area' ... shall be deemed to mean any area of the United States not included within the boundaries of any city, village, or borough having a population in excess of fifteen hundred inhabitants." 7 U.S.C. 913. "Once an area, which was theretofore 'rural,' is included within a municipality of 1,500 or more and becomes urban, it clearly falls outside the ambit" of the REAct. Decatur County Rural Elec. Membership Corp. v. Public Serv. Co., 261 Ind. 128, 301 N.E.2d 191, 198 (1973); accord City of Rochester v. Peoples Coop. Power Ass'n, 505 N.W.2d 621, 625 (Minn.Ct.App.1993). Therefore, when Stilwell, with a population of approximately 2,500 inhabitants, annexed Ozarks' territory, the REA's service obligation over the annexed area "expired."
 
 
 38
 The OREC Act, Okla. Stat. Ann. tit. 18, 437, does not conflict with the purposes of the REAct. Instead, it exhibits exactly the type of federal/state interrelation that the Supreme Court described in Arkansas Electric. 461 U.S. at 386, 103 S.Ct. at 1913. Enacted in 1939, the OREC Act is a comprehensive regulatory statute which steps in where Congress left off. Like the REAct, it promotes rural electrification by permitting the formation of rural electric cooperatives in Oklahoma, and by defining their powers. Okla. Stat. tit. 18, 437.2. The REAct does not purport to regulate the operation of rural electric cooperatives; it merely assists their operation by offering low interest financing. The OREC establishes the framework under which the REAct-spawned rural cooperatives can operate.
 
 
 39
 As part of this framework the OREC Act necessarily places limits on the powers it confers on the rural cooperatives. This includes a limitation that a rural cooperative's powers do not extend beyond rural areas, a term which is defined equally in both the REAct and the OREC Act. To argue that this somehow frustrates the purpose of the REAct is to contend that state regulations should empower rural cooperatives without limitations. Such a position is untenable.
 
 C.
 
 40
 We are not persuaded by Ozarks' suggestion that the REAct envisions a program of cross-subsidization. Ozarks cites several cases for the proposition that the purposes of the REAct are frustrated when a municipality "skims the cream," i.e. annexes and condemns the most densely populated (and therefore most profitable) areas away from an REA-funded cooperative. See Morgan City v. South Louisiana Elec. Coop., 31 F.3d 319 (5th Cir.1994); City of Madison v. Bear Creek Water Ass'n., 816 F.2d 1057 (5th Cir.1987); Pend Oreille, 417 F.2d 200. Nevertheless, (1) each of these cases is easily distinguished from the matter before us; and (2) the language of the REAct and the Supreme Court's decision in Arkansas Electric simply cannot support the "skimming the cream" argument.
 
 
 41
 Morgan City, while involving a municipality's attempted condemnation of electric facilities and consumers within an annexed area, was concerned with a totally different statutory framework. Moreover, in that case, the REA Administrator determined that the condemnation would jeopardize the financial health of the rural cooperative and would result in substantial harm to the federal rural electrification program. The Fifth Circuit clearly relied on the REA's conclusion in holding that the expropriation was preempted. Morgan City, 31 F.3d at 324. Notably, in the present case, the REA does not oppose the condemnation. Aplee. App. 14-15. We cannot see how the purposes of the REAct are frustrated in a case where the REA itself describes the impact of the condemnation as "minimal." Aplee. App. 14. We have no occasion to determine whether the REA's jeopardy determination could be contested.
 
 
 42
 Bear Creek is a condemnation case, but it too involves a different statutory scheme. In that case, the Fifth Circuit held that the municipality could not condemn a water system operated by a non-profit corporation funded by the Farmers Home Administration, despite the fact that the area in question had been annexed by the municipality. The federal statute at issue in Bear Creek, however, specifically provided that "[t]he service provided or made available through any such association shall not be curtailed or limited by the inclusion of the area within the boundaries of any municipal corporation." Bear Creek, 816 F.2d at 1059 (quoting 7 U.S.C.1926(b)) (emphasis added). Bear Creek presents an example of "impossibility" preemption, and not "frustration" preemption. In the present appeal, we are not confronted by a condemnation action which directly conflicts with an express statutory provision; therefore the rule annunciated by the Fifth Circuit in Bear Creek is not applicable here.
 
 
 43
 Pend Oreille is inapposite for the same reasons. In Pend Oreille, the Ninth Circuit held that "the purpose of the [REAct] would have been frustrated" by a condemnation which created a situation in which "the remaining portions of the system could not continue to operate with decent service and at decent rates." 417 F.2d at 201. Once again, however, the statutory framework differed and the REA opposed the proposed condemnation in Pend Oreille, distinguishing it from the present case, in which the REA chose not to oppose Stilwell's enforcement of Ozarks' original agreement, an agreement voluntarily entered into with full knowledge and acquiescence by the REA.
 
 
 44
 More generally, Ozarks urges that these cases support its position that Stilwell is precluded from "skimming the cream" away from Ozarks' customer base. Essentially, this is to argue that the REAct contemplates a system where rural customers are subsidized by relying on revenues generated from urban customers. We find no such intent either express or implied in the language of the REAct. The REAct subsidizes rural cooperatives by offering low-interest financing, not by making available to them more lucrative markets for electric power. Wabash Valley, 988 F.2d at 1483-84 ("When offered at the government's cost of borrowing, loans made by the REA subsidize rural power.... [T]he REAct allocates to the REA ... only limited authority for effectuating the goals of the REAct."); see also Arkansas Electric, 461 U.S. at 386, 103 S.Ct. at 1913. If Congress intended to have urban electricity consumers subsidize its aims of rural electrification it would have said so, and there would be no need to offer REA loans to the cooperatives as an incentive. But Congress chose the financing program outlined in the REAct, and not promises of an urban consumer base, as its subsidization mechanism. It is not the province of the courts to design new methods of financing rural electrification that Congress never contemplated.
 
 
 45
 We hold that Stilwell's condemnation under 437.2(k) of the OREC Act does not frustrate the purposes of the REAct and is not preempted. Therefore, the district court erred in granting Ozarks' motion for summary judgment.
 
 
 46
 For the foregoing reasons,
 
 
 47
 1. appeal 94-7135 is AFFIRMED;
 
 
 48
 2. appeal 95-7011 is REVERSED.
 
 
 
 [1]
 The REA is now known as the Rural Utilities Service ("RUS"). In this opinion, however, we will continue to refer to the RUS by its former, and more familiar, name